IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RR COMPANY OF AMERICA, LLC, | ) | CASE NO. 1:19 CV 539 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| BISHOP QUEEN, LLC, | ) | <u>MEMORANDUM OPINION</u> |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the Motion of Plaintiff RR Company of America, LLC ("RR") for Summary Judgment on its Complaint and Defendant's Counterclaims (ECF #82) and on the Motion of Defendant Bishop Queen, LLC ("BQ") for Summary Judgment on Plaintiff's Complaint and Partial Summary Judgment on Count 1 of BQ's Counterclaim for breach of contract. (ECF #85) For the reasons that follow, RR's Motion for Summary Judgment is granted and BQ's Motion is denied.

## FACTS[1]

On September 20, 2018, RR entered a 99 year Ground Lease with Donaldson Properties, Ltd ("Donaldson") for 11,500 square feet of the Chardon Bishop Shopping Center located at

---

[1] Except as otherwise cited, the factual summary is based on the Complaint and the parties' statements of fact. Those material facts which are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to the non-moving party.

28301 Chardon Road, Willoughby Hills, Ohio. See Ground Lease ECF #1 Ex. 1 The Lease authorized RR to use the Premises for a plasma donation center. *Id.* § (j). RR subleased the Premises to CSL Plasma ("CSL") to construct and operate the plasma donation center.

In November 2018, CSL and RR determined that there was no sanitary line in the leased premises where expected. Finishing out the premises to enable RR (or CSL) to operate a plasma donation center required installing sanitary sewer lines and domestic water service to the premises. The Lease provided that RR would provide "separate plumbing facilities and restricted service" prior to its occupancy:

> Tenant shall ... provide separate plumbing facilities and restricted service, and Landlord shall cooperate in the Tenant's separation of such facilities in a manner as to minimally affect such services to the remainder of the Shopping Center, and thereafter Tenant shall be responsible for any breakage, stoppage, or damage to such plumbing and electrical facilities.

ECF #1-1, § 11(i). On November 27, 2018, RR's property manager Laura McGrath sent an email to Rachael Hurst, Senior Director of Real Estate for Spigel Properties, Inc., the general partner of the Landlord Donaldson Properties, Ltd, requesting to "tie into the adjacent space and connect to existing" sanitary sewer lines and submitted a drawing showing the proposed connection to the sanitary line in the adjacent space. See McGrath Declaration and exhibits, ECF #82-5. Two days later, on November 29, 2018, Ms. Hurst replied that Donaldson would allow the connection to the sanitary line in the area indicated on the drawing submitted by RR subject to certain conditions. After some negotiation, RR and Donaldson entered into the First Amendment to the Ground Lease dated December 5, 2018 and signed on behalf of Donaldson and RR on December 20, 2018. (ECF #1Ex. 2) The First Amendment provides in relevant part:

> 1. Shared Plumbing. In addition to the Tenant's separate plumbing

> responsibilities stated in Section 11(I), Tenant will be allowed to connect to the sanitary line located outside the Premises as depicted on the attached Exhibit A. Subsequently, Tenant shall pay a tap fee in the amount of $5,000.00 in order to connect to the existing sewer lines.

The First Amendment also provides that "[i]n case of any inconsistency between the provisions of the Ground Lease and this Amendment, the latter shall govern and control." *Id.* at ¶5

While RR and Donaldson were negotiating the First Amendment, construction began on the new sanitary connection via the route and at the location outside the leased premises shown in Exhibit A to the First Amendment. On December 19, 2018, Donaldson emailed Ms. McGrath pictures showing the trenching that had reached outside the leased premises and noting that the work had ceased. (ECF #81-26, Ex. Z) Within the hour, Ms. McGrath responded that RR would pay the $5000 tap in fee for the access in lieu of shared line maintenance. Three hours later Ms. Hurst sent the revised Amendment in its final form with the $5000 tap in fee in lieu of shared line maintenance and requested that Ms. McGrath have it signed and returned for counter-signature as soon as possible so work could resume. (ECF #82-12, Ex. 1K) With the execution of the First Amendment on December 19, 2018, RR and Donaldson approved the connection to the existing sewer tie-in location outside the leased premises as shown in Exhibit A to the First Amendment. Further, Ms. Hurst testified that Donaldson anticipated and agreed that RR and its contractors had the right to use common areas for construction related activities. (ECF #82-16, Ex. 2 pp 58-61)

By January, RR's sub-tenant, CSL had begun the build out, including installing trenches for the sewer outside the premises as depicted on Exhibit A and it was visually obvious that CSL was using the adjacent landlord space to complete the construction per the Amendment. The Lake County plumbing inspector informed CSL's plumbing contractor that he could take the plumbing

construction up to the point of first inspection at his own risk and no construction could go further until the plumbing permit was approved. By January 29, 2019, CSL's project manager informed CSL that very little further work could take place until a permit is released. (ECF #81-7, Ex. G)

Defendant BQ acquired the Shopping Center effective February 1, 2019. While BQ had asked Donaldson for copies of RR's sublease with CSL, RR's construction plans and specifications, and building permits before the sale, Donaldson responded that RR had not provided those documents to Donaldson. Nevertheless, BQ bought the shopping center anyway and became successor Landlord, accepting the Shopping Center "as is," "where is," and "with all fault" and subject to all terms of the Ground Lease and Amendment and any and "all easements, ..., conditions, ..., terms of the ground lease, agreements, and other matters ... of record or apparent." (ECF #82-16, Ex. 2 pp 58-61)

On February 8, 2019, three days after BQ took possession of the Shopping Center, a lawyer representing BQ sent a letter via email and Fed Ex to Ms. McGrath demanding that RR and CSL cease and desist from conducting any new alterations to portions of the Shopping Center outside of the leased premises until they have first obtained written approval from BQ to proceed. (ECF #82-13, Ex. 1-L) Further, in order for BQ to give "informed consent" the letter demanded copies of 11 categories of documents, including all plans related to the "finish out of the premises," permit applications, plans submitted to the City of Willoughby or Lake County, the sub-lease with CSL, and all insurance required by the lease. Having received none of the requested documents, on February 18, 2019, BQ delivered a letter to Dan Nicholson, the Lake County Inspector in charge of the plumbing permit process and inspection of the sanitary sewer construction at the property, stating that it had not previously approved and currently does not

approve any request by CSL or RR to tap into or alter the sewer line that sits outside of the RR leased premises. (ECF #81-15, Ex.O) Thereafter, Lake County stopped the permitting process. BQ also instructed CSL contractors to cease work and constructed a wall blocking CSL from completing construction of the sewer tap in and blocking access to CSL's contractor's equipment and property.[2]

On February 19, 2019, BQ's lawyer sent another letter to Ms. McGrath with the caption "NOTICE OF DEFAULT OF GROUND LEASE." The letter noted that RR failed to provide any of the documents requested in the February 8 letter and that the failure to provide certain insurance documents and a "notice of commencement" put RR in default under the lease. The letter also asserted that the sewer construction to date was in violation of the lease.

On February 25, 2019, RR's attorney responded to BQ's Counsel's February 19 letter stating that the First Amendment to the Lease authorizes RR to connect to the sanitary sewer located outside the Premises and its actions violated the Lease, including BQ's letter to Inspector Nicholson which obstructed and delayed the permitting and work and BQ's visit to the Premises where it forced RR's trade contractors to cease work. Further, the letter asserted that all of the required permits, documents, filings and insurance documents relating to the project that were required by the Lease as Amended were provided to Donaldson; RR was never required to obtain BQ's prior and approval as the construction commenced before BQ took title to the Shopping Center and the Lease does not require RR to provide BQ with all of the documents requested in the February 8 letter. After detailing why RR was not in default of the Lease, RR

---

[2] At this time the work on the sewer tap in was halted because Lake County had yet to issue a permit.

noted that BQ is responsible for the continuing costs, damages and attorneys' fees resulting from its breach of the Ground Lease and tortious interference with the contractual rights and obligations of RR with CSL and the trade contractors and demanded that the wrongful acts cease. In conclusion, RR sought an immediate conference call with BQ and its counsel to resolve any questions and move the work forward. (ECF 81-22, Ex. 5C)

On March 5, 2019, RR's counsel sent an email to BQ's counsel attaching a copy of the plan for the sanitary sewer tap in on file with the County and requesting that BQ retract its February 13 letter to Inspector Nicholson to allow the permitting process to be completed. If BQ fails to retract the February 13 letter, RR would pursue all legal remedies. Thereafter, on March 7, 2019, Counsel for BQ wrote to Mr. Nicholson to update him on the current position of BQ regarding the sanitary sewer plans. BQ stated that it was reviewing the February 5, 2019 plan submitted to Mr. Nicholson by RR and noted that those plans contain several differences from the plans depicted in Exhibit A to the First Amendment. The letter emphasized that BQ has not approved the plan and is still evaluating the differences between the two sets of plans.

RR filed this action on March 11, 2019, for breach of lease and specific performance of the Lease requiring BQ to stop blocking RR and CSL from completing the connection to the sanitary sewer line outside the premises. RR also filed a Motion for a Temporary Restraining Order against BQ seeking to enjoin BQ from (1) obstructing or blocking RR's and CSL's access to the sanitary sewer line; or (2) removing or blocking RR's and CSL's contractors from accessing their contractor's property at the premises; and requiring BQ to (3) remove any walls blocking RR's and CSL's access to the sanitary sewer line connection; and (4) retract its letters to the Lake County General Health District stating that Landlord does not authorize RR's and CSL's

construction to complete the connections to the sanitary sewer line. A hearing on the TRO was held on March 21, 2019. After some testimony was taken, the parties reached an interim agreement which was read into the record. The agreement provides in relevant part that BQ will not interfere with the permitting process or CSL's or RR's application for a variance; or argue that the permits/variance should be denied because RR or CSL has no authority to tie into the sanitary sewer line outside the premises; BQ will cooperate in approving the connection to and any submetering into the domestic water service outside of the premises; and RR will submit its plan to BQ for how this will be done for BQ's consideration. All parties reserved their rights and arguments on all issues in connection with the litigation. The hearing was continued to May 1, 2019. (ECF #15 pp.42-43)

The injunction hearing resumed on May 1, 2019. At that point the plumbing permit had not been issued by Lake County because there was an issue of the plan not having been submitted under the current code thus requiring the issuance of a variance. At the hearing, J. Scott Scheel, the managing director of BQ, agreed that BQ would remove the wall blocking the tie-in construction and permit the tie-in as soon as a plumbing permit is issued by Lake County if RR "presents a plan that can be approved with minimal effect to the balance of the center." (ECF #28 pp93-94) BQ agreed that the Lake County inspector would make the determination of whether the plan had minimal effect on the balance of the center. With that agreement, the hearing was continued until May 13, when RR should have received the plumbing permit. (Id. at p. 99)

The plumbing permit was finally issued by Lake County on May 24, 2019 and RR connected to the sanitary sewer line and installed sub-metering to provide separate water service. The build out of the plasma center was completed and the plasma center has been open for

business since September 2019 without incident.³ Nevertheless, Plaintiff continues to press its breach of contract claim asserting that BQ breached the Amended Lease by its initial blocking of the sanitary sewer tie in and its interference in the permitting process and argues that RR is entitled to its attorneys' fees as the prevailing party under § 22 of the Lease. BQ has asserted five counterclaims but seeks partial summary judgment only on its first counterclaim for breach of contract and opposes RR's Motion for Summary Judgment.⁴ RR seeks summary judgment on all of BQ's counterclaims.

## STANDARD OF REVIEW

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citations omitted). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of

---

³ On September 6, 2019, the parties agreed that Plaintiff's Motion for a TRO and Preliminary Injunction (ECF # 4) and Defendant's Motion to Dismiss (ECF # 17) were moot and could be dismissed.

⁴ The parties' attempt to resolve the action in a January 2021 mediation failed.

the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. However, if the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-mover. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). Evidence may be presented by citing to particular parts of the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials. Fed. R. Civ. P. 56(c). In lieu of presenting evidence, Fed. R. Civ. P. 56(c) also allows that a party may show that the opposing party's evidence does "not establish the presence of a genuine dispute" or that the adverse party "cannot produce admissible evidence to support the fact."

According to Fed. R. Civ. P. 56(e),

[i]f a party fails to properly support an assertion of fact, or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or

(4) issue any other appropriate order

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## DISCUSSION

**1. RR's Claim of Breach of Contract**

RR asserts that the First Amendment to the Lease gave RR the right to connect to the existing sanitary sewer line located outside the leased premises and that BQ's blockage of the sewer construction and the permitting process violated the Lease. BQ submits that RR breached the Lease first by beginning construction of the sewer tie in without a permit in violation of Section 15(a) of the Lease which requires Plaintiff "to comply with all federal, state and

municipal laws, ordinances and regulations and maintain all necessary permits relating to the Premises and the business conducted therein." (ECF #1, Ex.1,§ 15(a)). BQ argues that pursuant to the doctrine of first material breach, "a party guilty of a material breach of contract may not maintain an action against the other party or seek to enforce the contract against the other party should that party subsequently breach the contract." *Diebold Nixdorf Inc. v. QSI, Inc.*, No. 5:20 CV 1135 (N.D. Ohio Nov. 9, 2020), *citing Bash v. Laikin*, No. 5:13 CV 2371, 2014 WL 3842884, at *14 (N.D. Ohio Aug. 1, 2014). Thus, it argues that its actions in stopping the work and permitting process were reasonable until RR obtained the necessary permit and provided additional information related to the project for BQ's evaluation.

While Plaintiff's plumbing contractor began work on the sewer tie-in the adjacent landlord space as shown on Exhibit A to the First Amendment before a permit was issued, the evidence shows that such practice was common in Lake County. The Contractor completed the construction up to the point of first inspection at his own risk and no construction could go further until the plumbing permit was approved and first inspection completed. The project had reached that point before BQ took possession of the shopping center. No violation was ever issued by Lake County or any other permitting authority relating to this construction project and all completed work on the project appears to have been properly permitted. Accordingly, BQ's argument that RR committed a first material breach excusing its own breach fails.

RR argues that BQ's approval of the sewer tie-in was not required because BQ acquired the shopping center subject to the terms of the Amended Lease and all necessary approval for temporary use of the landlord space and or common area for construction staging had been obtained from the former Landlord Donaldson. Accordingly, BQ was not justified in interfering

with construction or stopping the permitting process. While BQ eventually conceded that the First Amendment permits the sewer tie in, it continues to assert that the completed sewer tie-in violates the section 11(i) of Lease because RR's sanitary system is neither separate nor restricted because it is connected directly to the sanitary line that also services RR's neighboring tenant.

The interpretation of written contract terms "is a matter of law for initial determination by the court." *Stonebridge Operating Co., LLC v. Antero Res. Corp.*, 510 F. Supp. 3d 567, 574 (S.D. Ohio 2020)(citing *Phillips Exploration, Inc. v. Reitz*, 2012 WL 6594915, at *3 (S.D. Ohio Dec. 18, 2012) and *Absalom v. Hess Corp.*, 2014 WL 12746847, at *3 (S.D. Ohio Jan. 2, 2014); *see also Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993) (applying Ohio law). When confronting an issue of contract interpretation, the trial court must give effect to the intent of the parties and presumes the intent of the parties will "reside in the language they choose to use in their agreement." *Stonebridge Operating Co.*, 510 F.Supp. 3d at 574 *citing Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (1996). If the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. *Sunoco, Inc., (R& M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 404 (2011). If the plain language does not confer a "definite legal meaning," then the contract is ambiguous. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 219, 797 N.E.2d 1256 (2003). In other words, "[a]mbiguity exists only when a provision at issue is susceptible to more than one reasonable interpretation." *Lager v. Miller-Gonzalez*, 120 Ohio St.3d 47, 50(2008) *citing Hacker v. Dickman*, 75 Ohio St.3d 118, 119–120, 661 N.E.2d 1005 (1996)).

Here, the language of the First Amendment to the Lease is clear and permitted RR to connect to the sewer line in the adjacent space outside of the leased premises. The Amendment

provides in relevant part:

> 1. **Shared Plumbing**. In addition to the Tenant's separate plumbing responsibilities stated in Section 11(i), **Tenant will be allowed to connect to the sanitary line located outside the Premises** as depicted on the attached Exhibit A. Subsequently, **Tenant shall pay a tap fee in the amount of $5,000.00 in order to connect to the existing sewer lines.**

(ECF #1, Ex. 2)(emphasis supplied) There is no question that BQ acquired the shopping center subject to the terms of the Lease as amended. While the Amendment also states "in addition to Tenant's separate plumbing responsibilities," that phrase must be read in connection with the overwhelming purpose of the Amendment which was to allow RR to tap into the existing sanitary sewer line in the adjacent area outside the Premises. If the parties did not intend to permit a shared sewer line, there would be no need for a tap in fee "in order to connect to the existing sewer lines." While RR could not finish the sewer line tap in without the required permit, BQ's actions stopped the permitting process to RR's detriment and added delay.[5] Accordingly, BQ's actions in walling off the construction and stopping the permit process were not reasonable and violated the Amended Lease.

Similarly, BQ's argument that RR's sanitary system violates Section 11(i) of the Lease in that it is not "separate nor restricted" because it is connected directly to the sanitary line that also services the neighboring tenant is misguided. Section 11(i) states that "Tenant shall, prior to occupancy of the Premises, provide separate plumbing facilities and restricted service, and Landlord shall cooperate in the Tenant's separation of such facilities in such manner as to minimally affect services to the remainder of the Shopping Center." (ECF #1, Ex. 1§11(i)) While

---

[5] Admittedly, Plaintiff's plumbing contractor caused much of the permitting difficulties by submitting plans under an expired code, thus requiring the issuance of a variance.

the First Amendment begins with the phrase "[i]n addition to the Tenant's separate plumbing responsibilities stated in Section 11(i)," the Amendment clearly permits the tie in to the existing sewer line outside the premises. Indeed the Amendment is titled "shared plumbing." Moreover, the phrase "separate plumbing facilities and restricted service" does not necessarily involve separate sanitary sewer lines as BQ posits. As RR notes "separate plumbing facilities" in dictionary terms means "not shared with another"–i.e., separate bathrooms. Here, the bathrooms in RR's space are not shared by another tenant. Further, "restricted service" refers to utility service, in this case water because the sewer service is billed off water usage. RR provided the agreed limited water service by installing a sub-meter in the agreed location of the premises and shopping center. Thus, RR's reading of the meaning of Section 11(i) comports with the language of the First Amendment while BQ's interpretation does not. Reading the Lease as a whole to give effect to the parties' intent, as required by the rules of contract interpretation, clearly demonstrates that BQ's interpretation of Section 11(i) is wrong. Accordingly. RR's motion for summary judgment on Count 1 of the Complaint for breach of contract is granted.[6]

**2. BQ's Counterclaim for Breach of Contract**

BQ seeks partial summary judgment on its breach of contract counterclaim. BQ's breach of contract counterclaim alleges that RR committed five breaches of the Lease:

1. Breached Section 6 by using or allowing sub-tenant to use common areas at the shopping center without BQ's authorization;

---

[6] Count 2 of the Complaint for Declaratory Judgment requests a judicial declaration that RR is entitled to connect to the sanitary sewer line located outside the Premises under the terms of the Lease. That determination has already been made with respect to Plaintiff's claim of breach of contract and a further declaration is unnecessary.

    2. Breached Section 15 of the Lease by installing plumbing at the premises without first obtaining an approved plumbing permit in violation of Ohio law;

    3. Breached Section 11(i) of the Lease by refusing to provide for separate plumbing facilities or restricted service prior to occupancy;

    4. Breached Section 14 of the Ground Lease by installing trash containers in a location not previously approved by BQ;

    5. Breached Sections 15(c) and 19 of the Lease by damaging the shopping center's roof, allowing water to penetrate LaSalle's premises , damage its inventory, interfere with LaSalle's use of the premises and not curing the default within 60 days.

    BQ seeks summary judgment only on its claim that RR breached Section 11(i) of the Lease because its sanitary system is neither separate nor restricted because it is connected directly to the sanitary line that also services another tenant. However, as explained in part 1 above, RR's sanitary system complies with requirements of the Amended Lease. Accordingly, BQ's motion for partial summary judgment on its breach of contract counterclaim is denied.

    RR seeks summary judgment on all of BQ's breach of contract claim. First, BQ claims that RR violated the Lease by using common areas of the shopping center without BQ's authorization. RR argues that the contractor's use of the common areas at the shopping center during construction for staging was not a breach of the lease because Section 6 of the Lease gave RR the right to use the common areas for any "activities ... that Landlord in the exercise of good business judgment deems to be advisable." Landlord Donaldson expressly permitted CSL's contractors to use the common areas for staging. (ECF #82-16, Ex. 2 pp 58-61) The construction began and was on-going when BQ acquired the shopping center. As the former property manager

Hurst noted in her deposition, it is in the best interest of the landlord to permit the use of common spaces for construction activities in a lease that requires a build out in order to help facilitate the expeditious completion of the construction project. BQ eventually (during hearings before this Court) agreed to permit the completion of the construction project, and at least by implication, the continued use of common spaces for construction staging. The use of the common areas in this limited instance did not violated the Lease.

    BQ's claim that RR breached Section 15 by installing plumbing without a permit is baseless. As noted above, the plumber complied with all laws and ordinances and obtained a permit before completing the plumbing installation and before inspection. Further, plumbing inspector Nicholson agreed that the contractor could begin trenching and installing sanitary pipes while the plumbing plans and application were under review at his own risk so long as he did not conceal any of the installed plumbing. The permit eventually issued and Inspector Nicholson was able to perform all required inspections on the project, thus there was no breach of the lease.

    Next BQ claims that RR breached Section 14 of the Lease by installing trash containers in a location not previously approved by BQ. However, Donaldson, at least implicitly, approved the location of RR's trash containers before BQ acquired the shopping center. Donaldson appointed its agent, Foresite Properties, to represent the owner with respect to zoning issues needed for approval of the operations of CSL Plasma Center. Although BQ disagrees, ultimately the dumpster enclosure's location was a zoning issue that needed review and approval. Foresite submitted the location of the dumpster that the Zoning Inspector approved and the dumpster enclosure was built in the approved location before BQ bought the shopping center. As such, previous approval of the trash containers by BQ was impossible, and more importantly, unnecessary as BQ acquired the shopping center "as is."

Finally, BQ argues that RR breached the Lease when its roofing contractor damaged the roof of tenant LaSalle Furniture. BQ sent a letter to RR's counsel on May 7, 2019, stating that LaSalle Furniture had notified BQ that roofers caused water penetration into its premises causing damage to its merchandise. BQ told RR that its roofers were the only contractors on site that day and asked RR to submit a claim to its insurer. (ECF #82-25) RR asserts that its contractor repaired the roof and that RR submitted a claim to the appropriate insurer who reimbursed LaSalle for its damages and LaSalle executed a release. Thus, any breach was cured. BQ responds that the cure was ineffective as LaSalle has sued both BQ and RR in Lake County Common Pleas Court on issues related to the damages caused by the roofing contractor. That lawsuit is still pending. As any liability of the parties to each other or LaSalle based upon the roof leak will be addressed by the Lake County Court of Common Pleas, this part of BQ's breach of contract counterclaim (ECF #38, ¶¶ 59-62) is dismissed without prejudice. Otherwise, RR's motion for summary judgment as to Count 1 of the Counterclaim is granted.

**3. BQ's Tort Counterclaims**

BQ also asserts counterclaims of trespass (based on RR's use of the common area and landlord space of the shopping center for construction without BQ's permission); nuisance (based on RR's failure to maintain the construction site and perform construction activities in a workmanlike manner); negligence(failed to exercise ordinary care in course of construction activities); and permanent injunction(to prohibit RR's unauthorized use of BQ's property–i,e, the landlord and common spaces). (ECF #38) RR moves for summary judgment on these counterclaims because they are not independent of the Lease.

Courts in Ohio have long held that "it is no tort to breach a contract, regardless of motive." *Tripoint, LLC v. Rhein Chemie Corp.*, No. 1:14 CV 360, 2014 WL 3785766, at *3 (N.D.

Ohio July 31, 2014) quoting *Battista v. Lebanon Trotting Ass'n*, 538 F.2d 111, 117 (6th Cir.1976). *See also Textron Financial Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 684 N.E.2d 1261, 1270–71 (Ohio App. 9th Dist.1996) ( "the motive of a breaching party to a contract is irrelevant to the contract action"); *Salvation Army v. Blue Cross and Blue Shield of Northern Ohio*, 92 Ohio App.3d 571, 636 N.E.2d 399, 403 (Ohio App. 8th Dist.1993) ("It is not a tort to breach a contract, no matter how willful or malicious the breach); *Teknol v. Buechel*, 1999 WL 33117391 (S.D.Ohio Aug.9, 1999) (same). As Judge Gaughan explained in *Tripoint*:

> [W]here the gravamen of the complaint is an action for breach of contract, appending tortious language such as "willful, intentional or malicious" will not transform the breach of contract action into one sounding in tort. *Salvation Army*, 636 N.E.2d at 403. "A tort exists only if a party breaches a duty which he owes to another independently of the contract, that is, a duty which would exist even if no contract existed." *Battista*, 538 F.2d at 117. Moreover, "in addition to containing an independent duty of that created by contract, an action arising out of contract which is also based upon tortious conduct must include actual damages attributable to the wrongful acts of the alleged tortfeasor which are in addition to those attributable to the breach of the contract." *Textron*, 684 N.E.2d at 1271 (emphasis in original).

*Tripoint*, 2014 WL 3785766, at *3. As in *Tripoint*, the tort counterclaims asserted by BQ address the same conduct alleged to have breached the Lease resulting in the same alleged damages as those alleged in its breach of contract claim. See BQ's disclosures listing its damages demonstrates that its contract and tort damages are the same. (ECF #44) As such, Plaintiff's motion for summary judgment on Defendant's counterclaims is granted.

**4. RR's request for Attorneys' Fees**

RR asserts that BQ's breach of the Lease, which delayed construction and forced RR to resort to litigation to re-start the permitting process and force BQ to permit the sewer tie-in,

caused it to incur over $500,000 in legal fees and costs. As such RR claims that it is entitled to its attorneys' fees under Section 22 of the Lease. Section 22 provides in relevant part:

> ATTORNEYS' FEES. In the event of any litigation between Landlord and Tenant arising out of this Lease, the unsuccessful party in such litigation shall pay the court costs and reasonable attorneys' fees of the prevailing party.

(ECF #1, Ex. 1, § 22) BQ counters that Section 27 of the Lease bars RR from recovering its attorneys' fees. It contends that RR's case is premised on the theory that BQ improperly withheld approval and consent to allow RR to proceed with construction in the Landlord space and common area. As such, Section 27, which provides "in each and every instance in which Landlord's approval or consent is required under this Lease, Landlord shall not be liable for damages (whether direct, consequential or otherwise) by reason of its failure to grant such approval or consent (unless Landlord is found to have acted in bad faith), and Tenant's sole remedy shall be an action for injunctive relief or specific performance." (ECF #1, Ex. 1, § 27)

As the Court found above, Plaintiff's claim is not premised on the theory that BQ improperly withheld approval and consent. Rather, the claim is that BQ breached the Lease by interfering with the permitting process and by walling off the sewer tie in construction. The sewer tie in was already authorized by the Amended Lease before BQ purchased the shopping center, thus its consent or approval was not required. BQ acquired the shopping center subject to the Amended Lease. Accordingly, Section 27 of the Lease is not applicable.

As RR prevailed on its breach of contract claim against BQ, BQ must pay RR's court costs and reasonable attorneys' fees. Accordingly, RR is directed to file its request for attorneys' fees and court costs, along with supporting documentation by September 24, 2021. BQ may file

any response by October 8, 2021.

## CONCLUSION

For the reasons set forth above, there is no genuine issue of material fact that would preclude judgment in favor of Plaintiff on its complaint or Defendant's counterclaims. Accordingly, Plaintiff's Motion for Summary Judgment (ECF #82) is granted and Defendant's Motion for Partial Summary Judgment (ECF #85) is denied.

IT IS SO ORDERED.

DATED: _September 10, 2021_

_____
DONALD C. NUGENT
UNITED STATES DISTRICT JUDGE